WAGNER MILLS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wagner Mills, Inc. v. Commissioner
Docket No. 6679-66.
United States Tax Court
T.C. Memo 1974-274; 1974 Tax Ct. Memo LEXIS 46; 33 T.C.M. (CCH) 1267; T.C.M. (RIA) 740274; October 21, 1974, Filed. *46 Petitioner entered into agreements with a citrus nursery whereby the nursery agreed to plant and grow a certain number of citrus trees for petitioner. During the growing period, petitioner assumed the risk of any loss of the nursery stock occasioned by acts of God or other casualties beyond the grower's control. Held, petitioner must capitalize the costs of acquiring and planting seed and of grafting the buds to the root stock. Petitioner may deduct the remaining amounts paid pursuant to the contract. Joseph Ginsburg, for the *47 petitioner. Ronald M. Frykberg, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in petitioner's income tax and by its amended answer seeks the following increased deficiencies: [1]
Year
Deficiency Per Statutory Notice
Increased Deficiency Per Amended Answer 1961
$14,747.69
-
1962
22,381.01
$ 1,927.49
1963
8,397.66
26,453.70
The issue for decision is whether petitioner may deduct nt and grow a certain number of citrus trees for petitioner. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, Wagner Mills, Inc., is a corporation, organized under the laws of the State of Nebraska and licensed to do business in the State of Arizona, with its principal office at 1303 Colfax Street, Schuyler, Nebraska. Petitioner filed its United States corporation *48 income tax returns for the calendar years 1961, 1962 and 1963 with the district director of internal revenue at Omaha, Nebraska. With certain minor exceptions not involved herein, petitioner kept its books and records and reported its income for Federal tax purposes on the accrual method of accounting. During 1960 and 1961, the petitioner purchased several plots of land in Yuma County, Arizona. Petitioner's business intention was to grow oranges and other citrus on this land. The land was leveled and otherwise prepared for the future planting of citrus trees. Until the time the citrus stock was ready for planting in petitioner's orchards, the land was used for growing alfalfa. In order to obtain the required trees, the petitioner, on March 29, 1960, entered into an agreement with Dr. Alton H. Finch (hereinafter referred to as Finch) and J. H. Snell (hereinafter referred to as Snell), doing business as Wellton-Mohawk Cooperative Citrus Nursery of Yuma (hereinafter referred to as Wellton-Mohawk Nursery). Under that agreement Wellton-Mohawk Nursery agreed to plant and grow 47,000 trees of citrus nursery stock until ready for replanting in an orchard. The agreement provided in *49 part as follows: 2. Said nursery stock shall be grown by grower and shall be and remain the property of the owner, so long as the owner is not in default hereunder. 3.It is contemplated that said nursery stock shall be grown sufficiently for replanting within twenty-five (25) months from date of planting. However, no assurance can be given by grower that such nursery stock will be grown sufficiently for replanting within such 25 month period. Therefore, the nursery stock shall be deemed grown and ready for removal from grower's land and ready for replanting at such time as the trees shall have reached a minimum of one-half (1/2) inch calibre measured one inch above the bud. This agreement pertains to trees produced or to be produced from seed planted in the Spring of 1960. * * * 5. At such time as such nursery stock is ready for budding, the owner will designate to the grower the variety or varieties to be budded to each of his trees in such nursery and the number of trees to be budded to each specific variety. The grower agrees to bud the nursery stock of the owner as so directed, subject to the then availability of suitable root stock and buds. * * * 6. For such *50 service, the owner agrees to pay to grower a sum equal to five cents (5") per tree per month for each of 25 months, such sum shall be billed by grower upon invoice itemized as to expenses, including supervision, and paid by owner once each month during the anticipated 25 month growing period. Provided, however, that if at the end of the 25 month growing period the records of the grower reflect that their labor costs have increased beyond the present laborer's rate of 75" per hour, then at that time, an adjustment shall be made to compensate grower for such increased labor cost, and owner agrees to pay his proportionate portion of said increased labor expense upon receipt of grower's statement therefor. 7. At such time as said nursery stock is ready for replanting as specified in paragraph 3 hereof, the owner agrees to remove his nursery stock within a reasonable time from the premises of the grower, at his cost and expense, including also the cost of balling each tree. 8. It is further agreed that in the event of mutual agreement by the grower and owner that it is desirable to place polyethylene shelter over said trees in the nursery row (not seed bed), and such polyethylene *51 cover is installed, the owner agrees to pay to the grower his proportionate cost thereof upon receipt of grower's statement therefor. The owner's proportionate cost shall be the proportion which the number of his trees in said nursery bears to the total number of trees in the nursery covered by said polyethelene cover. 9. The grower shall not be responsible for loss to owner's trees occasioned by acts of God or other casualties beyond their control. On February 20, 1962, a second agreement was entered into between the petitioner and the Wellton-Mohawk Nursery. Under the second agreement the Wellton-Mohawk Nursery agreed to plant and grow 70,000 trees of citrus nursery stock until ready for replanting in an orchard. The second agreement was nearly identical to the first agreement, dated March 29, 1960. However, paragraph 6 of the second agreement was revised to reflect that petitioner agreed to pay "a sum equal to five cents (5") per tree per month for each of 27 months * * *." At the time the two agreements between the petitioner and Wellton-Mohawk Nursery were executed, it was contemplated that the growing of orchard-ready trees would require a minimum growning period of *52 two years and that in all probability the period would range somewhere between two and three years. The five cents per month, per tree, payments over the twenty-five month and twenty-seven month periods, as specified in the two agreements, were based upon reasonable estimates of what it would cost for orchard-ready trees, regardless of the length of growing time. During 1960 through 1964 the Wellton-Mohawk Nursery was growing citrus nursery stock in substantial numbers for others in addition to those for the petitioner. Prior to planting in orchards, the citrus seedlings were not marked, tagged or otherwise identified as to the contract purchaser for whom they were being grown. Most, if not all, of the seedlings grown under the first agreement were grown on land other than land owned by the petitioner.Some of the nursery's operations in growing part of the seedlings under the second agreement were on land of the petitioner. In fulfilling the agreements with the petitioner, the Wellton-Mohawk Nursery utilized standard nursery practices in creating and preparing orchard-ready citrus plants. The preparation process from the time the seed is planted until the seedling becomes an *53 orchard-ready plant normally takes from two to three years. The first step is the planting of seeds of the desired root stock about one to three inches apart in a seedbed. There are a number of different types of root stock from which to choose. The seed is normally planted about February or March and then grows in the seedbed for about a year. We find that in the present case the cost of acquiring and planting the seed was ten cents per tree. When the weather warms in the spring, the plant is removed from the seedbed and transplanted to nursery rows about ten to twelve inches apart. After several months to a year in the nursery row, a bud is inserted or grafted into the seedling root stock. Prior to budding, a root stock itself is unable to produce an edible fruit. There are various varieties of orange and lemon buds that may be selected for grafting into the root stock. After the bud emerges, the original root stock is bent over. We find that in the present case the cost of grafting a bud onto the root stock was ten cents per tree. Following the budding process the seedling is kept in the nursery row where the bud grows for about a year, resulting in an orchard-ready tree *54 at the conclusion of the one-year period. While the seedlings are growing in the seedbeds and nursery rows, certain maintenance practices, such as watering, fertilizing, weeding, cultivating and insect control, are required. During the winter months the seedbeds and nursery rows are often protected by polyethylene shelters.At the conclusion of the two to three-year period when the seedlings have become orchard-ready plants, each one is dug up with a ball of dirt surrounding the roots and wrapped with burlap or other wrapping and then loaded onto a truck for transporting to the orchard in which they will be permanently planted. Just prior to or at the time of transplanting to the orchard, the top of the seedling is cut off. The normal practice is that only orchard-ready trees are planted in a permanent orchard. Following three to four years in the orchard the trees will begin producing fruit. The average life expectancy of a citrus tree ranges from twenty to forty, or more, years. Most of the citrus trees grown by Wellton-Mohawk Nursery for the petitioner under the two agreements were orange trees. The first major planting of trees grown under the first agreement occurred during *55 the fall of 1962 when approximately 20,000 trees were planted in petitioner's orchards. By September 1, 1963, all but 1,140 of the 47,000 trees provided for under the first agreement had been planted in petitioner's orchards. The remaining 1,140 trees were planted in petitioner's orchards prior to October 1, 1964. Trees provided for under the second agreement were planted as they matured or when petitioner's land was ready. Two of the payments in 1961 made by the petitioner to the Wellton-Mohawk Nursery were not related to the two agreements dated March 29, 1960, and February 20, 1962. The May 8, 1961, payment of $1,254.87 covered charges for labor in digging and balling 6,300 Hamlin orange trees and tax. The May 24, 1961, payment of $450 was made to acquire 300 Hamlin orange trees, at $1.50 each, which were ready to be budded. The Hamlin trees were acquired from a nursery other than the Wellton-Mohawk Nursery. OPINION The issue is whether the amounts paid or accrued by the petitioner in connection with the two agreements with the Wellton-Mohawk Nursery represent ordinary and necessary expenses incident to the development of an orchard or non-deductible capital expenditures *56 relating to the acquisition of an orchard. The petitioner argues that it is entitled to deduct these costs in the year paid or accrued pursuant to section 162[2] and section 1.162-12, Income Tax Regs. The respondent argues that these amounts represent the cost of the acquisition of orchards and that the substance of the two agreements was to provide the petitioner with orchard-ready trees at the end of a two to three-year growing period. The respondent, in effect, contends that all of the amounts paid by the petitioner to the Wellton-Mohawk Nursery were paid so that the petitioner could acquire a capital asset and that these amounts must therefore be capitalized pursuant to section 263(a) (1). He argues that the maintenance charges of 5" per month per tree were actually installment payments for the purchase price of orchard-ready trees. Although we agree with the respondent that the petitioner would be required to capitalize the costs of the trees if he had purchased orchard-ready trees from a nursery, we do not agree with the respondent's *57 view that in substance such a sale took place in the present factual situation. When a citrus grower purchases orchard-ready trees from a nursery, he acquires title to the trees as of the date of the sale. Thus, the risk of loss to those trees for the three-year period prior to their becoming orchard-ready is assumed by the nursery. In the present case, however, the petitioner assumed ownership of the nursery stock during the entire time that it was being grown by the nursery. In recognition of this fact, the contracts specifically provided that the petitioner bore the risk of any loss of the nursery stock occasioned by acts of God or other casualties beyond the grower's control. Thus, petitioner bore the risk of loss from that point in time when the citrus seeds were planted by the grower. Accordingly, we conclude that title to the nursery stock passed to petitioner at that time and that the petitioner is entitled to deduct those expenses that would have been deductible had petitioner itself grown the trees. In support of his argument that the transactions were in substance installment sales, the respondent draws attention to the contractual provision that the monthly payments *58 would cease at the end of the 25 or 27-month periods, even though it might take as many as 36 months to grow the trees to the point of being ready for the orchard. The respondent argues that if the contracts were really for the performance of services, the parties would have agreed that the monthly payments would continue until the time that the trees were orchard-ready. He argues that the provision for payment of a fixed amount to be paid on a monthly basis for a fixed time period is an indication that the parties in reality negotiated an installment sales contract. We do not agree with this contention. The fact that the monthly payments would cease even though the nursery might still be required to provide further maintenance does not establish that the payments were not for services. We know of no reason why services to be performed for an indefinite length of time cannot be contracted for at a fixed price. Furthermore, respondent's analysis of the transaction fails to recognize that the petitioner assumed ownership of the nursery stock and the risks attached thereto at a much earlier point in time than he would have had he simply purchased orchard-ready trees. The respondent *59 has attempted to circumvent this crucial factor by arguing that the petitioner assumed a risk on paper only. He makes reference to the testimony of Dr. Finch that there was little danger of hazard to the trees and that the risk-of-loss provisions did not need to appear in the agreements. He also states that there is no evidence that any trees were lost under either agreement. We have concluded that the petitioner did assume an actual risk, and we therefore reject respondent's agrument. Assuming arguendo that the risk of loss was slight, any loss that might have occurred, through freezing for example, would have been borne by the petitioner, who owned the seedlings from the time they were planted. We attach no significance to respondent's observation through hindsight that no losses were actually incurred.
We next must determine which amounts paid pursuant to the contracts are currently deductible and which must be capitalized. Section 1.162-12(a) provides in part that "[amounts] expended in the development of farms, orchards, and ranches prior to the time when the productive state is reached may, at the election of the taxpayer, be regarded as investments of capital * * *." *60 This regulation allows a taxpayer to capitalize rather than deduct currently expenditures made in the years prior to the bringing of the orchard to a productive state provided those expenditures are of such a character that in the regular course of maintaining a productive orchard they would be regarded as operating expenses and currently deductible. Estate of Richard R. Wilbur, 43 T.C. 322 (1964); Thompson & Folger Co., 17 T.C. 722 (1951). In Wilbur the expenses of this nature included cultural expenditures in the form of irrigation, cultivation, pruning, fertilizing, spraying, and other care expenses incurred prior to the time that the trees were fruit producing. The deductible expenses include the developmental expenditures that were incurred by the petitioner so that the growing process would continue in the desired manner. Certain expenses incurred in establishing a citrus orchard are not deductible and must be capitalized. These expenses include the preparatory expenditures incurred so that the petitioner could begin the growing process. Thus, land clearing expenditures and the cost of planting citrus trees were required to be capitalized in Thompson & Folger Co., supra, *61 and H. L. McBride, 23 T.C. 901 (1955). This Court delineated these distinctions in Robert L. Maple, T.C. Memo. 1968-194, affd. 440 F.2d 1055 (C.A. 9, 1971), in determining which expenses incurred pursuant to a contract for the development of citrus trees were currently deductible and which were required to be capitalized. In Maple, a partnership entered into an agreement with a nursery whereby the partnership purchased seedlings from the nursery at thirty cents apiece and the nursery agreed to maintain, cultivate and bud the seedlings in its nursery for $2.45 per tree. The risk of loss from causes other than the poor workmanship of the nursery was upon the partnership. This Court held that the partners were entitled to deduct the cost of their maintenance contract as a business expense in the year incurred, with the exception of the costs of budding the trees, which costs were held to be capital expenditures because they were not sufficiently similar to the expenses that would be required to maintain them once they were productive. This Court's decision in Maple was affirmed by the Ninth Circuit Court of Appeals (440 F.2d 1055 *62 (C.A. 9, 1971)) in which it held that the expenses of maintaining agricultural items in the preproductive state are deductible if they are sufficiently similar to the expenses that will be required to maintain them once they are productive. The Commissioner advanced the argument that even if some of the expenses were of a deductible nature, the partners were not entitled to deduct them because the work was not done by the partners on their own land. The Court concluded that the partners were entitled to the tax benefits afforded farmers because they assumed the risk that the crop would never be harvested because of unforeseen circumstances and the crop related to the partners' farming endeavors. Applying the respondent's regulations to the facts in the instant case, we conclude that the costs of acquiring the planting seed and of grafting the buds to the root stock must be capitalized because they were preparatory expenditures incurred so that the petitioner could begin the process of growing orange trees. Although the budding process occurs over a year after the seed is initially planted, the fact remains that this process is performed to prepare the bud to grow and not to further *63 develop its growth. It is a peculiarity of an orange tree that its component parts are planted in two separate operations. We do not believe that tax treatment of the cost of planting the seed should differ from that of grafting the bud simply because one process was performed before the other. We hold that the other amounts paid under the contract are currently deductible because they were incurred so that the growing process would continue in the desired manner. The deductible expenses include those relating to maintenance of the seedlings both before and after the trees were budded. Although the budding process, a capital expenditure, occurred after some of the maintenance expenses were incurred, the maintenance expenses nevertheless related to continuation of the growing process. Decision will be entered under Rule 155 . Footnotes
1. The increased deficiencies result from respondent's allegation in the amended answer that certain amounts deducted as labor expenses are required to be capitalized because they represent preparatory costs in connection with the acquisition of citrus trees. ↩
2. All statutory references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise indicated. ↩